Case No. 25-1987

---

# United States Court of Appeals
# for the Sixth Circuit

---

**AIRPRO DIAGNOSTICS, LLC,**

*Plaintiff-Appellant,*

v.

**DREW TECHNOLOGIES, INCORPORATED; OPUS IV, INCORPORATED; AUTOENGINUITY, LLC; and BRIAN HERRON**,

*Defendants-Appellees.*

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Linda V. Parker
Case No. 2:22-cv-12969

_____

**APPELLANT'S BRIEF**

_____

Adam J. Brody (P62035)
Neil E. Youngdahl (P82452)
VARNUM LLP
P.O. Box 352
Grand Rapids, MI 49501-0352
ajbrody@varnumlaw.com
neyoungdahl@varnumlaw.com
*Counsel for Appellant*

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS<br>AND FINANCIAL INTERESTS</u>

Pursuant to Sixth Circuit Rule 26.1, AirPro Diagnostics, LLC, discloses that (1) it is not a subsidiary or affiliate of a publicly owned corporation; and (2) no publicly owned corporation, not a party to the appeal, has a financial interest in the outcome.

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................vi

STATEMENT OF JURISDICTION....................................................... vii

STATEMENT OF ISSUES ........................................................................ix

INTRODUCTION ...................................................................................1

STATEMENT OF THE CASE....................................................................1

    I.    STATEMENT OF FACTS ......................................................... 1

        A.    AIRPRO'S USE OF AUTOENGINUITY'S GIOTTO SOFTWARE. ....... 1

        B.    DEFENDANTS' ATTEMPTS TO COMPETE. ................................... 3

        C.    THE PARTIES' MPAS. ........................................................ 4

        D.    AIRPRO'S REPRESENTATIONS REGARDING ITS SERVICES......... 10

        E.    THE FORD LAWSUIT AND OPUS'S ACQUISITION OF AUTOENGINUITY. ................................................................. 11

        F.    THE NEW EULA ................................................................ 12

    II.    PROCEEDINGS BELOW ........................................................ 15

STANDARD OF REVIEW ........................................................................16

SUMMARY OF THE ARGUMENT ...................................................................18

ARGUMENT ........................................................................................20

    II.    THE DISTRICT COURT ERRED IN DISMISSING AIRPRO'S TORTIOUS INTERFERENCE CLAIM................................................................. 25

    III.    THE DISTRICT COURT ERRED IN DISMISSING AIRPRO'S UNFAIR COMPETITION CLAIM. ............................................................. 31

CONCLUSION .....................................................................................35

# INDEX OF AUTHORITIES

## Cases

*AB Stable VIII, LCC v. Maps Hotels and Resorts One, LLC,*
2020-0310-JTL, 2020 WL 7024929 (Del. Ct. Ch., Nov. 30, 2020) ....................25

*Akno 1010 Market Street St. Louis Missouri, LLC v. Pourtaghi,*
43 F.4th 624 (6th Cir. 2022) ............................................................................ vii

*Am. Title Ins., Co., v. East West Financial Corp.,*
959 F.2d 345 (1st Cir. 1992)............................................................................25

*Bloomfield Estates Improvement Ass'n, Inc., v. City of Birmingham,*
479 Mich. 206, 737 N.W.2d 670 (2007)...........................................................24

*Calderone v. United States,*
799 F.2d 254 (6th Cir. 1986) ...........................................................................20

*Cockrel v. Shelby Cnty. Sch. Dist.,*
270 F.3d 1036 (6th Cir. 2001) .........................................................................20

*Desert Palace, Inc., v. Costa,*
539 U.S. 90 (2003)...........................................................................................21

*Feldman v. Green,*
138 Mich. App. 360, 360 N.W.2d 881 (Mich. Ct. App. 1984) ................... 32, 34

*Good Housekeeping Shop v. Smitter,*
254 Mich. 592, 236 N.W. 872 (1931) (citation omitted)...................................35

*Hardin v. Pitney-Bowes Incorp.,*
451 U.S. 1008 (1981)........................................................................................21

*Hill v. Lappin,*
630 F.3d 468 (6th Cir. 2010) ...........................................................................21

*In re ClassicStar Mare Lease Program,*
727 F.3d 473 (6th Cir. 2013) ...........................................................................21

*Knight Enterprises, Inc. v. RPF Oil Co.,* 299 Mich. App. 275,  345 N.W.2d 345
(2013) .......................................................................................... 31, 32, 33, 34

*Lucas v. Monroe County*,
  203 F.3d 964 (6th Cir. 2000) ...............................................................19

*Paterek v. Village of Armada*,
  801 F.3d 630 (6th Cir. 2015) ...............................................................30

*Perk v. Reader's Digest Ass'n, Inc.*,
  931 F.2d 408 (6th Cir. 1991) ...............................................................20

*Prime Rate Premium Finance Corporation, Inc., v. Larson*,
  930 F.3d 759 (6th Cir. 2019) ............................................................ vii

*Russo v. City of Cincinnati*,
  953 F. 2d 1036 (6th Cir. 1992) ...........................................................20

See *Johnson v. Austin*,
  406 Mich. 420, 280 N.W.2d 9 (1979)...................................................24

*Shropshire v. Laidlaw Transit, Inc.*,
  550 F.3d 570 (6th Cir. 2008) ...............................................................25

*Simply Wireless, Inc. v. T-Mobile US, Inc.*,
  115 F.4th 266 (4th Cir. 2024) ...................................................... 20, 28

*Sunrise Foods Int'l, Inc. v. Agridient*, Inc.,
  2025 WL 1643741 (E.D. Mich. January 24, 2025) ...................................... 32, 34

*Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*,
  115 F.4th 480 (6th Cir. 2024) ........................................... 19, 20, 26, 28

## Statutes

28 U.S.C. § 1291 ............................................................................... vii

28 U.S.C. § 1332.............................................................................. vii

28 U.S.C. § 1332(c)(1)...................................................................... vii

## Other Authorities

11 James William Moore, et al., Moore's Federal Practice § 56.40(1)(c) (3d ed. 2010) ...............................................................................................20

**<u>Rules</u>**

Fed. R. App. P 4(a)(1)(A) ...................................................................................... viii

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

AirPro Diagnostics, LLC ("AirPro"), respectfully requests oral argument. This case presents nuanced issues regarding how to properly adjudicate state law via federal procedure and oral argument would allow the panel to exhaust any questions it may have regarding these issues.

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332.  As alleged in Plaintiff's Complaint (ECF No. 1, PageID.1-2), Defendant Drew Technologies, Inc., ("Drew Technologies") is a citizen of Michigan because it is incorporated under Michigan law and has its principal place of business in Michigan, *see* 28 U.S.C. § 1332(c)(1); Defendant Opus IVS, Inc. ("Opus"), is a citizen of Delaware and Michigan because it is incorporated under Delaware law and has its principal place of business in Michigan; Defendant AutoEnginuity, LLC ("AutoEnginuity"), is a citizen of Michigan because its sole member is Drew Technologies, *see Akno 1010 Market Street St. Louis Missouri, LLC v. Pourtaghi*, 43 F.4th 624, 626 (6th Cir. 2022) ("A limited liability company . . . has the citizenship of its members[.]"); and Defendant Brian Herron is a citizen of Michigan because he is domiciled in Michigan, *see Prime Rate Premium Finance Corporation, Inc., v. Larson*, 930 F.3d 759, 765 (6th Cir. 2019).   Defendants are therefore citizens of Michigan and Delaware.   None of Plaintiff's members is a citizen of these states, (Compl., ECF No. 1, PageID.1), establishing diversity-of-citizenship under § 1332.  Moreover, the amount in controversy exceeds $75,000.  (*Id*.).

This Court has appellate jurisdiction under 28 U.S.C. § 1291.  The District Court entered its Judgment on September 29, 2025.  (Judgment, ECF No. 66).  This

judgment disposed of all claims in this suit.  Plaintiff filed a timely notice of appeal on October 29, 2025.  (ECF No. 69); *see* Fed. R. App. P 4(a)(1)(A) (providing for a 30-day deadline to file a notice of appeal in most civil cases).

## STATEMENT OF ISSUES

I.      Whether the District Court erred in granting summary judgment on AirPro's breach-of-contract claim by failing to properly apply the MPA's contractual burden-shifting provision and disregarding Airpro's proffered evidence.

II.    Whether the District Court erred in granting summary judgment on AirPro's tortious interference claim by improperly resolving disputed issues of fact regarding Defendants' intent, despite circumstantial evidence that Defendants surreptitiously modified the EULA to target AirPro's business model.

III.   Whether the District Court erred in granting summary judgment on AirPro's unfair competition claim by merely incorporating its tortious interference analysis without performing a standalone analysis under the less stringent "fair play" standard applicable to unfair-competition claims.

**INTRODUCTION**

**STATEMENT OF THE CASE**

I.   **STATEMENT OF FACTS**

A.   **AIRPRO'S USE OF AUTOENGINUITY'S GIOTTO SOFTWARE.**

AirPro was formed in 2016 to distribute a new automotive diagnostic device designed by Lonnie Margol, founder of AirPro, and CompuFlash, LLC, that combined the module programming features of a preexisting CompuFlash device with the multi-vehicle, remote diagnostic and calibration capabilities of Mr. Margol's invention. (Declaration of Lonnie Margol, at ¶ 3, ECF No. 54-2, PageID.2074; Margol Dep. at 21:4-14; 25:17-26:1, ECF No. 54-3, PageID.2080-82). AirPro distributed the device primarily to collision repair shops, but also to mechanical or other specialty repair shops, and provided skilled remote diagnostic and calibration services to all shops.   (Margol Decl. at ¶ 4, ECF No. 54-2, PageID.2074; Margol Dep. at 25:21-24, ECF No. 54-3, PageID.2081).

The device utilized an interface known as J2534, produced and distributed by Drew Technologies, and an aftermarket scan tool diagnostic software known as "Giotto," created by AutoEnginuity. (Margol Decl. at ¶5, ECF No. 54-2, PageID.2075; Margol Dep. at 24:10-25, ECF No. 54-3, PageID.2081).   AirPro selected the Giotto product in large part because of its wider vehicle coverage and the fact that, as AirPro understood it, the Giotto product had been derived directly

from the original equipment manufacturer ("OEM") data and instructions contained in the Equipment and Tool Institute ("ETI") Tek-Net library.  (Margol Decl. at ¶6, ECF No. 54-2, PageID.2075).

Regarding why AirPro selected AutoEnginuity, Chuck Olsen of AirPro confirmed that "it was very important to [AirPro] that a company that we engaged with that did that was a member of ETI, had access to the ETI TekNet library and licensed information from the OEMs and development of their applications." (Olsen Dep. at 38:8-14, ECF No. 54-4, PageID.2094).  AutoEnginuity was able to develop the Giotto Product utilizing information from ETI because of legislation passed in 2013.  (*Id*.; *id*. at 184:12-18, PageID.2102).  Specifically, in 2013, the State of Massachusetts passed right to repair, or "R2R," legislation.  (R2R Agreement,  ECF No. 54-5, PageID.2105-11).

As described by ETI, the entire purpose of the legislation was to "require that data be made available to [aftermarket] tool manufacturers for the purpose of developing multi-brand diagnostic tools with equivalent capabilities of the automaker's dealer shop tool[.]"  (Herron Dep Tr. Ex., ECF No. 54, PageID.2043-44; Olsen Dep at 66:18-67:1, ECF No. 54-4, PageID.2096-97).  Lothar Geilen of Opus conceded that he "wouldn't doubt" that the goal of this law was the creation of aftermarket scan tools with equivalent capabilities of automaker dealership tools. (Geilen Dep. at 85:24-86:5, ECF No. 54-7, PageID.2133-34).

2

B.    DEFENDANTS' ATTEMPTS TO COMPETE.

In 2016, Drew Technologies began to try to compete with "CompuFlash/AirPro" via its "Remote Assistance Program" ("RAP"), which used the same technical concept that CompuFlash had pioneered previously. (Margol Decl. ¶7, ECF No. 54-2, PageID.2075). However, at this time, AirPro was in an unprecedented position: the proprietary combination of hardware and software used in the AirPro device was not generally known in the industry. (*Id.*). AirPro developed this combination specifically "to meet the demands that the collision industry was asking of the service." (Olsen Dep. at 37:3-12, ECF No. 54-4, PageID.2093).

At that time, Drew Technologies was largely unable to service collision repair shops or successfully provide remote diagnostic software via its RAP product, instead doing the "significant majority" of its work with mechanical shops, and only offering collision-related services in a "limited fashion." (Geilen Dep. at 57:16-20, 101:7-23, ECF No. 54-7, PageID.2131, 2135; Margol Dep. at 65:21-66:17, ECF No. 54-3, PageID.2085). Drew Technologies was selling interfaces to collision repair shops, not providing remote diagnostic services, with an aim to get into the collision repair market to assist in programming. (Olsen Dep. at 43:4-12, ECF No. 62-2, PageID.2534). Similar to Drew Technologies, AutoEnginuity also did not "have

3

any intent to go there" because AutoEnginuity was not interested in "do[ing] any business with anybody else in remote." (*Id.*, at 130:10-19, PageID.2542).

However, after AirPro disclosed its entire business model, methods and operation, as described more fully below, Drew Technologies and AutoEnginuity were both aiming to get into the collision repair market to assist in programming as Drew's RAP or Cardaq could not effectively provide comprehensive diagnostic services. (Margol Dep. at 57:7-12, 65:14-66:17, ECF No. 62-3, PageID.2557, 2559-60. As a result, in 2017, Brian Herron, President of Drew Technologies, approached Chuck Olsen of AirPro to explore potential partnership or acquisition opportunities between AirPro and Drew Technologies. (Margol Dep. at 57:1-9, 53:1-8; 55:14-56:19, ECF No. 54-3, PageID.2084-85.

## C.    THE PARTIES' MPAS.

After some preliminary discussions, on February 10, 2017, Drew Technologies and AirPro, and Drew Technologies and CompuFlash, entered into identical Mutual Party Agreements (together the "MPAs," each an "MPA"). (MPAs, ECF No. 1-2, PageID.22-25; 1-3, PageID.26-29). The crux of the MPAs was that the companies could disclose certain confidential information "solely for the purposes of: evaluations, discussions, and potential partnerships between Drew Tech and AirPro relating to the areas of automotive products." (*Id.* at ¶ 5, PageID.23, 27). This information included "business strategies, pricing, techniques, computer

4

programs, methods, drawings, formulas, specifications, software, or other data of a business or technical nature[.]"  (*Id.* at ¶ 2).

The language regarding the potential for harm was reflected in the executed MPAs, with the addition of relief in the form of attorneys' fees:

> **Each Party recognizes that the other Party would be seriously, immediately, and irreparably harmed and damaged if any unauthorized use was made of the Information, or if the Information were disclosed**, without the Discloser's consent, to any third party. In the event this Agreement is breached or threatened to be breached, the non-breaching Party shall be entitled to injunctive relief (including, without limitation, temporary restraining orders and injunctions), to enforcement by specific performance of this Agreement, and to damages including, but not limited to, its or their **reasonable attorneys' fees**.

*(Id.* at ¶ 18,  PageID.25, 29) (emphasis added).

The executed MPAs contain other important provisions:

| Paragraph | Provision |
|---|---|
| 3, 4 | Each party may disclose "Confidential financial proprietary information, proprietary hardware and software design and know-how, confidential product information (including but not limited to [the company's] flash and programming tools, applications, and derivative products), confidential business and market information, and other proprietary confidential or non-public information furnished in oral, visual, written and/or other tangible form, information shall include but not be limited to operating specifications, product specifications, strategic marketing and pricing information." |
| 7 | For a period of three (3) years following the expiration of this Agreement, the Recipient shall hold in confidence and, except |

| | |
|---|---|
| | as set forth herein, shall neither disclose any Information nor authorize or assist in any disclosure of Information. |
| 9 | For a period of three (3) years following the expiration of this Agreement, Recipient agrees not to prepare or attempt to prepare any works derived, whether in whole or in part, from the Information received from the Disclosure without the prior written consent of the Discloser.  If at any time the Recipient produces works or products related to the Information, the Recipient shall have the burden of proving through competent evidence the independent development of such works by Recipient's employees having no access to the Discloser's Information. |

(*Id.* at ¶¶ 3, 4, 7, 9, PageID.23-24, 28-29)  (emphasis added).

The parties signed their MPAs on February 10, 2017.  *Id.*  Just a few days later, Mr. Herron represented to Mr. Margol that they two "can be good allies in this market" and sent a list of questions on behalf of Drew Technologies to help get things started."  (Emails, ECF No. 54-9, PageID.2140-41.)  As soon as two weeks after that, Mr. Herron and Lothar Geilen of Opus were inquiring about meeting in-person with representatives of AirPro to exchange information relating to topics such as projections and employee benefits.  (Emails, ECF No. 54-10, PageID.2143-44).  At all times, however, AirPro's disclosures were made pursuant to the MPA. (Margol Decl. ¶ 12; ECF No. 54-2, PageID.2076; Margol Dep. at 148:12-16, 336:14-9, PageID.2088, 2090).

During this time, AirPro disclosed to Drew Technologies and AutoEnginuity propriety information regarding the intimate details of how AirPro's products

6

function, specifically relating to "the use of multiple apps on the same tool," the ability to "switch[] from one vehicle interface to another," "the method of handling customer requests," AirPro's "ten-minute response pledge" and how AirPro addresses the pledge, how AirPro "manage[s] the scan reports in a very quick and efficient manner to deliver those to shops," and the method of efficiency related to triaging service requests. (Olsen Dep. at 129:13-18; 121:6-19, 23-25; 122:1-8, ECF No. 54-4, PageID.2097-99).

AirPro also provided suggestions regarding product development, such as navigating the path to compatibility through J2534. (*Id*. at 118:1-25, 119:1-23, PageID.2097-98). Because AirPro had launched in collision shops nationwide, AirPro was constantly developing its products during this time, and AirPro "showed [Defendants] everything." (*Id*. at 121:6-7, PageID.2097). As described by Mr. Olsen, this included: "[AirPro's] use of AE and working with AE, providing software log reports and assisting AE with continued development of tool capabilities using available OEM-licensed software application data and/or TekNet Library information available from ETI." (Olson Dep., at 195:2-13, ECF No. 62-2, PageID.2544). Mr. Olsen testified in detail regarding AirPro's "recommendations for continuous improvement" that it disclosed to AutoEnginuity, including "continuous web reporting, comparison of the functionality and capabilities of an OEM diagnostic application, compared to what was available within AE, and

7

continued suggestions for AE for certain functionality that they had not put into the Giotto software that was beneficial for collision repair customers."    (*Id*. at 196:20-197:1, PageID.2544).  He further stated:

> We disclosed our entire process of how we put together the different applications to effectively deliver diagnostics, along with expanding beyond programming events of the tool, how we put those together, and how we managed the OEM software applications of when they were used and when they were not used. Of -- and let me kind of rephrase that. Multiple OEM applications -- and this was a big question, and I've been challenged on this by our other competitors. There's no way that you can use multiple OEM applications on a single tool because they won't comply. They don't -- you can't load them all on the same tool at the same time.
>
> We developed a process where we could unload and offload OEM applications to eliminate the conflicts of multiple applications being on the same tool. Because applications -- different applications --… -- will not all run at the same time. So if you have that -- because they share resources of the computer. So in order to be able to do that, you have to very quickly offload one application and onload another so that the application will work properly without any conflicts. That was something unique that we figured out, and we did share … in verbal -- verbal conversations when -- … Brian and Lothar visited [AirPro], and also how we switch from one vehicle communication interface to another, how we manage that. That was very unique. That had never happened before.

(*Id.* at 110:13-22, PageID.2539 (emphasis added)).

AirPro also used its comprehensive knowledge of "the collision workflow of what was needed in th[e] development" of the Giotto software to "create[] APIs to improve efficiencies between…the Giotto software and [AirPro's] Orion system." (*Id*. at 133:6-24, PageID.2542).  AirPro disclosed such confidential information to

8

AutoEnginuity and Drew pursuant to the MPA: "we felt like they were straight up with us.  There was mutual opportunities, and we were continuing to…purchase CARDAQ and put things together." *Id.*

Although the parties got to the point of exchanging proposed Letters of Intent, further negotiations did not result in a deal, for the acquisition of AirPro or any other working relationship. (Herron Dep. at 62:16-25, 72:4-6, 72:16-17, 73:4-6; 78:2-12, ECF No. 54-6, PageID. 2117-19).  Rather than entering into a deal with AirPro, Opus instead "went forward and developed" exactly what AirPro had suggested previously, and confidentially pursuant to the parties' MPAs, to directly compete with AirPro. (Olsen Dep. at 118:1-25, ECF No. 54-4, PageID.2097; Herron Dep. at 127:21025, 128:1, ECF No. 54-6, PageID.2124.  at 127:21-25; 128:1.

Indeed, AirPro's disclosures were the sole cause of Opus/Drew Technologies' newfound ability to enter the collision space, especially with respect to diagnostics, as Opus/Drew Technologies, as noted above, did not compete substantially in that space at the time. (Herron Dep. at 127:10-25, ECF No. 54-6, PageID.2124; Geilen Dep. at 101:7-23, ECF No. 54-7, PageID.2135, 128:1.  By early 2021, unbeknownst to AirPro, Opus was growing its business "substantially," expanding its customer base into the collision repair space, especially targeting "more MSOs" (multi-store operator), also known as "collision companies that own more than…10 stores." (Herron Dep. at 27:14-25, ECF No. 54-6, PageID.2116).

### D.    AIRPRO'S REPRESENTATIONS REGARDING ITS SERVICES.

At various times, AirPro referred to the services provided via its device using terms like "OEM sourced," "OEM equivalent," and "OEM compliant" because the Giotto software was derived from data provided directly from OEMs, and because that description was consistent with Mr. Olsen's discussion with Greg Potter, the Chief Technology Officer of ETI, among others. (Olsen Dep. at 67:18-25, 68:1-11, ECF No. 54-4, PageID.2096).

Mr. Potter "manages the process" by which companies access OEM data through ETI's TekNet Library. (*Id.* at 61:2-17, PageID.2095). In light of Mr. Potter's experience in the industry and his involvement in and knowledge of ETI's operations, Mr. Olsen was comfortable relying on that opinion in AirPro's representation of its products:

> [T]his goes back to the conversations that I …had with Greg Potter and I had with multiple people in the industry of -- of the best way to describe this. Because there -- there was tools out there that were not legitimate tools, and there are tools that are legitimate that source the information -- licensed information from the OEM through ETI or direct licensing. So that OEM-sourced was the -- the best attempt. Like I said, I had conversations with Greg Potter about it. I had conversations with other people … about how best to differentiate a legitimate properly licensed tool that uses the … OEM information to provide the same functionality that is achieved with an OEM scan tool application.
>
> * * *
>
> Based on the conversations that I had with Greg Potter to describe -- and again, describing the differences from copied or pirated software to

10

properly licensed software -- that it was sourced from the OEM data available in TekNet Library and/or licensing, which -- in the relationship with Jay, we believed that was exactly what it was.

(*Id*. at 67:20-68:11, 229:2-16, PageID.2096; Response Brief, ECF No. 62, PageID.2508-9).

### E.    THE FORD LAWSUIT AND OPUS'S ACQUISITION OF AUTOENGINUITY.

In February 2020, Ford Motor Company and a related entity filed a lawsuit against AirPro (the "Ford Lawsuit"), asserting various claims, including with respect to the manner in which AirPro marketed its services. (Compl., ¶ 56-57, ECF No. 1, PageID.11).  In broad brush, Ford claimed that AirPro's description of its remote diagnostic scan tool as "OEM sourced," "OEM equivalent," and "OEM compliant" constituted unfair competition and deceptive trade practices. (*Id*.).

At the same time that Ford was suing AirPro, Opus acquired AutoEnginuity. (Herron Dep. at 91:3-7, ECF No. 54-6, PageID.2120).  Prior to this acquisition, AutoEnginuity was just the vendor of AirPro's diagnostic software.  But as a result of this acquisition, AutoEnginuity became AirPro's direct and largest competitor. (Margol Dep. at 41:8-10, ECF No. 54-3, PageID.2083).

At that time, Mr. Herron contacted Mr. Olsen at AirPro and informed Mr. Olsen that the acquisition would not change AirPro's relationship with Defendant AutoEnginuity in any way and that AirPro should continue to conduct business with

Defendant AutoEnginuity as usual, even though Defendants were now direct competitors of AirPro. (Olsen Dep., at 131:7-132:13, ECF No. 54-4, PageID.2100).

However, shortly after Opus's acquisition of AutoEnginuity, Opus began actively aiding Ford in its lawsuit against AirPro. (Emails, ECF No. 54-11, PageID.2146-47). In May 2021, Ford submitted as an exhibit to a filing a letter purportedly sent by Mr. Herron to Mr. Margol on March 11, 2020 related to AirPro's alleged conduct. (Herron Dep. Tr. Ex., ECF No. 54, PageID.2051). Mr. Herron could never come up with proof that he had actually sent this letter to Mr. Margol. (Herron Dep. at 171:6-12, ECF No. 54-6, PageID.2126). Both Mr. Olsen and Mr. Margol confirmed that AirPro never received the letter. (Olsen Dep. at 205:21-206:3, ECF No. 62-2, PageID.2545; Margol Dep. at 184:5-23, ECF No. 62-3, PageID.2564).

## F. THE NEW EULA.

From the beginning, AirPro licensed the AutoEnginuity Giotto product pursuant to a EULA, which contained no restrictions on where the services could be performed using the software or the manner in which AirPro could market its services. (EULA, ECF No. 1-1, PageID.20-21).

Once Opus acquired AutoEnginuity in 2020, however, it made the decision to modify its EULA, adding terms that directly targeted AirPro's business, under the guise of addressing concerns raised by Ford. (Geilen Dep. at 72:17-20, 98:18-22,

12

ECF No. 54-7, PageID.2132, 2135).  This new EULA (the "New EULA") was implemented in December 2020, without informing anyone at AirPro.  (Margol Decl. ¶ 18, ECF No. 54-2, PageID.2077; Olsen Dep. at 141:8-15, ECF No. 54-4, PageID.2101).

The New EULA contained restrictions on how the licensee could market the Giotto product: "[Y]ou may not, nor may you permit any third party to: . . . make statements that diagnostic services performed using Software are equivalent to the OE diagnostic system." (New EULA, ECF No. 1-4, PageID.31-32).  The New EULA also, for the first time, <u>appeared to prohibit AirPro's remote diagnostic business model</u>: "[Y]ou may not, nor may you permit any third party to: . . . use the Software on any computer that is not under the same rooftop (and within 500 ft.) as the vehicle the Software is being connected to for diagnostics" (the "New EULA's Geographical Restriction").  (*Id*. at PageID.31).  Further, the New EULA prohibited concurrent use: "multiple users are not allowed to concurrently use a copy installed on a single computer." *See id.*  The New EULA mandated that a second license be bought in such a case. *See id.*

Beginning in August 2021, Mr. Herron began to threaten to terminate AirPro's software license, alleging that AirPro breached the undisclosed New EULA such that termination was justified.  (Margol Decl. ¶ 19, ECF No. 54-2, PageID.2077).  Specifically, Opus alleges that AirPro breached the sections of the New EULA

13

discussed above. (Answer and Counterclaims, ECF No. 21, PageID.436-38). Representatives from AirPro attempted multiple times to address Opus's alleged concerns about AirPro's marketing and use of the Giotto software after Opus secretly amended the EULA. (Olsen Dep. at 206:25-209:4, ECF No. 62-2, PageID.2546). Mr. Olsen testified about AirPro's multiple attempts to resolve Mr. Herron's alleged concerns. *See id*. Mr. Olsen also had discussions with Mr. Horak about Opus's alleged issue with concurrent users. (*Id*. at 208:1-14, PageID.2546). Time and time again, Mr. Olsen had phone calls with Defendants' representatives in which he expressed, "What do we need to do next? What can we do? We never got any reply. When we sent some of the other things, we didn't get another reply. He just didn't answer." (*Id*. at 208:22-209:54).

AirPro's efforts in this regard culminated in September 2021, when Mr. Margol sent an email with specific proposed language to Mr. Herron. (Herron Dep Tr. Ex., ECF No. 62, PageID.2505-56). Notably, Mr. Horak - the founder of AutoEnginuity - conceded in sworn testimony that Mr. Margol's September 2021 proposed language would be accurate, meaning that it would adequately address the alleged "concerns" raised by Opus. (Horak Dep. at 69:1-70:1, ECF No. 62-7, PageID.2618-19). But despite AirPro's good faith attempts to address Opus's concerns, Opus "terminated" AirPro's license and right to use the AutoEnginuity product on October 21, 2021. (Margol Decl. ¶ 20, ECF No. 54-2, PageID.2077). As

14

a result, AirPro was forced to transition to new diagnostic software and hardware vendors and incurred significant costs through the process.  (Margol Decl. at ¶ 21; ECF No. 54-2, PageID.2077; Margol Dep. at 158:16-24, ECF No. 62-3, PageID.2563).

## II.　PROCEEDINGS BELOW

On December 8, 2022, AirPro filed its Complaint against Defendants, alleging state-law claims for breach-of-contract, unfair competition, and tortious interference.  (Complaint, ECF No. 1, PageID.15-17).  After discovery, the District Court granted summary judgment on these claims to Defendants.  (Opinion and Order, ECF No. 65).  Although the Court made various rulings (including granting summary judgment to AirPro on counterclaims that Opus had filed), many of those ruling are not at issue on appeal.  Accordingly, AirPro limits its discussion of the District Court's decision to those aspects encompassed by this appeal.

First, the District Court held that AirPro "offer[ed] nothing beyond mere speculation" that what was disclosed under the MPA was used by Defendants and that "AirPro does not offer any facts from which one could draw the inference that the information was used." (*Id*. at PageID.2749).  The District Court did not address the MPA's burden shifting framework in its analysis (under which Defendants were required to come forward with evidence) or the evidence that AirPro actually did submit on this point.

15

Second, the District Court granted summary judgment on AirPro's tortious-interference claim, finding that Defendants' actions were not "per se wrongful" and had not been done with the necessary wrongful intent. (*Id*. at PageID.2753-2756).

Third, the District Court granted summary judgment on AirPro's unfair-competition claim. The entirety of the Court's substantive analysis on this point was two sentences: "AirPro's claim of unfair play is based on the same conduct as its tortious interference claims. For the reasons discussed with respect to that claim, the Court finds Defendants entitled to summary judgment[.]" (*Id*. at PageID.2756).

AirPro filed a timely appeal of the District Court's grant of summary judgment to Defendants. (Notice of Appeal, ECF No. 69).

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of summary judgment de novo." *Lucas v. Monroe County*, 203 F.3d 964, 971 (6th Cir. 2000). "The standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC,* 115 F.4th 480, 488 (6th Cir. 2024). This Court recently explained that when the movant bears the burden, they must satisfy a "more rigorous summary-judgment standard" than that which applies when the movant does not bear the burden:

> "[W]here the moving party has the burden [of proof] ... his showing
> must be sufficient for the court to hold that no reasonable trier of fact

16

could find other *489 than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis omitted) (quotations omitted); see also 11 James William Moore, et al., Moore's Federal Practice § 56.40(1)(c) (3d ed. 2010) ("When the movant bears the burden of persuasion at trial, the movant must produce evidence that would conclusively support its right to a judgment after trial should the nonmovant fail to rebut the evidence."). But "[w]hen the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial," which can be done by identifying the absence of evidence. *Calderone*, 799 F.2d at 258–59 (quotations omitted). Put differently, when the moving party bears the burden of proof, their "initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (quotations omitted)).

*Next Century Rebar*, 115 F.4th at 488-89 (emphasis added).  As explained below, Defendants bear the burden of proof as to AirPro's breach-of-contract claim, while AirPro bears the burden as to its other claims.

For all claims, however, AirPro's evidence "is to be believed, and all justifiable inferences are to be drawn in [AirPro's] favor." *Russo v. City of Cincinnati*, 953 F. 2d 1036, 1041-42 (6th Cir. 1992).  "[E]ven circumstantial evidence—or reasonable inferences therefrom—can defeat a summary judgment motion," *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 115 F.4th 266, 281 (4th Cir. 2024), especially when subjective motive is a key issue in the case, *see Perk v. Reader's Digest Ass'n, Inc.,* 931 F.2d 408, 411 (6th Cir. 1991) (a party opposing summary judgment can "present proof of malice in the form of cumulative circumstantial evidence" because circumstantial evidence "is often the only way to

17

prove malice"); *see also Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010) ("[B]ecause of the difficulty in producing direct evidence of . . . motive, circumstantial evidence can suffice."). "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc., v. Costa,* 539 U.S. 90, 100 (2003).

Perhaps most importantly for purpose of this appeal, when questions of intent and motivation are central to the claims at issue, summary judgment is not appropriate. *See Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008, 1008–09 (1981) ("It has long been established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment. It is equally clear that where such issues are presented, the submission of affidavits or depositions is insufficient to support a motion for summary judgment."); *In re ClassicStar Mare Lease Program*, 727 F.3d 473, 484 (6th Cir. 2013) (explaining that claims involving intent may be determined on summary judgment only "when the evidence is 'so one-sided that no reasonable person could decide the contrary'").

## **SUMMARY OF THE ARGUMENT**

The District Court erred by granting summary judgment to Defendants on each of AirPro's three claims.

First, the District Court erred in dismissing AirPro's breach-of-contract claim by applying the wrong burden of proof and not accounting for AirPro's evidence. The MPA between the parties contains an express burden-shifting provision that places the burden on Defendants to prove, through competent evidence, that they independently developed any works related to the confidential information AirPro disclosed. Because Defendants bore the burden of proof on this issue, they were required to meet a more rigorous summary-judgment standard under this Court's precedent—that is, they had to show that their evidence was so powerful that no reasonable jury would be free to disbelieve it. Defendants failed to meet this standard. The record contains substantial circumstantial evidence that Defendants used AirPro's confidential information to develop competing products, and the District Court improperly placed the burden on AirPro to prove misuse.

Second, the District Court erred in dismissing AirPro's tortious interference claim by improperly resolving disputed issues of fact regarding Defendants' intent. The evidence establishes that Opus acquired AutoEnginuity—AirPro's software provider—and then surreptitiously amended the EULA to target AirPro's business model, all while assuring AirPro that nothing had changed. The timing of these events, combined with evidence that Opus actively assisted Ford in its lawsuit against AirPro, creates at least a genuine issue of material fact as to whether Defendants' actions were a guise for improperly interfering with AirPro's business

19

relationships.  This kind of circumstantial evidence of motive and intent—such as the timing of events—is sufficient to defeat summary judgment on claims involving subjective intent.

Third, the District Court erred in dismissing AirPro's unfair competition claim by simply incorporating its erroneous tortious interference analysis without performing the required standalone analysis.  Unfair competition requires only a showing of conduct contrary to "fair play"—a far less stringent standard than that applicable to a tortious interference claim.  The evidence that Defendants secretly modified the EULA to target AirPro's entire business model, refused to engage with AirPro's good-faith attempts to address their concerns, and ultimately terminated AirPro's software license—all while AirPro's competitor controlled the lifeblood of its business—clearly raises issues of fair play that must be resolved by a jury.

## ARGUMENT

### I.    THE DISTRICT COURT ERRED IN DISMISSING AIRPRO'S BREACH OF CONTRACT CLAIM.

Drew Technologies sought summary judgment on AirPro's claim for breach of the MPA on several grounds, most of which were properly rejected by the District Court.  Where the District Court erred, however, was in finding that there was no genuine issue of fact as to whether Drew Technologies had proven that it did not use the information disclosed by AirPro in developing its products, which it was required to do under the burden-shifting methodology of the MPA.  The MPA's contractual

20

burden-shifting methodology is critical at this procedural posture because it establishes Drew Technologies' summary-judgment burden.

Under Michigan law, parties may preemptively shift the burden-of-proof for potential claims via contract. Specifically, Michigan law holds that "the burden of producing evidence is not invariably allocated to the pleader of the fact to be proved" and "may be otherwise allocated" based on "special policy considerations." *See Johnson v. Austin*, 406 Mich. 420, 432, 280 N.W.2d 9 (1979). Michigan recognizes "the freedom of individuals freely to arrange their affairs via contract" and the "fundamental tenet" that "unambiguous contracts . . . must be enforced as written[.]" *Bloomfield Estates Improvement Ass'n, Inc., v. City of Birmingham*, 479 Mich. 206, 212, 737 N.W.2d 670 (2007). On this point, Michigan goes so far as to say that contractual language trumps subjective views of fairness and justice. *Id*. ("[W]hen resolving a contractual dispute, society is not motivated to do what is fair or just in some abstract sense, but rather seeks to divine and enforce the justifiable expectations of the parties as determined from the language of their contract."). "When contracts are formed, the parties to the contract are the lawmakers in such realm and deference must be shown to their judgments and to their language as with regard to any other lawmaker." *Id*.

Accordingly, a Michigan court would enforce a contractual burden-shifting framework as justified by *Johnson*'s special-policy factor. This result accords with

21

the approach of Michigan's sister states, *see, e.g., AB Stable VIII, LCC v. Maps Hotels and Resorts One, LLC,* C.A. No. 2020-0310-JTL, 2020 WL 7024929, at \*48 (Del. Ct. Ch., Nov. 30, 2020) ("Under Delaware law, parties can allocate the burden of proof contractually."), and this Court must enforce contractual burden-shifting frameworks as a matter of state substantive law in diversity cases. *See Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 571 (6th Cir. 2008) ("Because our jurisdiction is premised on diversity of citizenship, we apply state substantive law.") (citation omitted); *Am. Title Ins., Co., v. East West Financial Corp.*, 959 F.2d 345, 348 (1st Cir. 1992) ("Burden of proof is substantive in nature and therefore is governed by state law.").

As noted above, the MPA specifically prohibits one party from "preparing or attempting to prepare any works derived, whether in whole or in part, from" the information provided by the other party. (MPAs, ECF No. 1-2, PageID.22-25; 1-3, PageID.26-29). And, if works related to the information disclosed are created, then the party that received the information "shall have the burden of proving through competent evidence the independent development of such works by Recipient's employees having no access to the Discloser's Information." *Id.* Through this contractual language, Defendants voluntarily and unambiguously assumed the burden to <u>disprove</u> any future breach-of-contract claim premised on unlawful use of AirPro's information.

22

Thus, when Drew Technologies moved for summary judgment on AirPro's breach-of-contract claim, it was seeking summary judgment on a claim upon which it bore the burden of proof. *Next Century Rebar*'s "more rigorous" summary-judgment standard therefore applied, and Drew Technologies' "initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." 115 F.4th at 488-89.

Drew Technologies did not carry that high burden in the proceedings below, and it certainly did not show that there were no issues of fact on that front, such that summary judgment would be warranted under any standard. Instead, the District Court improperly shifted the burden and held that "AirPro did not offer any facts from which one could draw the inference that the information [provided by AirPro] was used." (Opinion, ECF No. 65, PageID.2749). Respectfully, the District Court was wrong.

As detailed above, and unbeknownst to AirPro, Drew Technologies was actively assessing the confidential information that AirPro had disclosed and was using it to enhance and develop its own offering. Despite its claim that its remote scanning service was developed in partnership with General Motors, Drew Technologies actually developed its RAP product after discussions with Scotty West and Steve Casella, founders of CompuFlash, and pursuant to the MPA. (Olsen Decl.

23

¶ 9, ECF No. 62-5, PageID.2575-76). CompuFlash discussed with Drew Technologies in detail the way that it was using the device that it was ordering from Drew Technologies. (*Id.* at ¶ 10). Meanwhile, at the time, the RAP product incorporated General Motor's OEM software for its transmission programming services on the transmission programming services. (*Id.* at ¶ 11). Drew Technologies was actively seeking an alternative solution because it was experiencing challenges with licensing the General Motors software. (*Id.* at ¶ 12). As a result, Drew Technologies began developing its product leveraging the confidential information disclosed by AirPro. (*Id.* at ¶ 13).

Specifically, AirPro shared detailed proprietary information regarding its business model, including: remote technician dispatching methodology, service pricing structure, integration of AutoEnginuity Giotto software with the Cardaq interface, and use of ORION (AirPro's proprietary diagnostic management software). (*Id.* at ¶ 14). Through the course of the MPA, AirPro demonstrated how this proprietary combination of hardware and software enabled efficient remote diagnostic services, invoicing, and reporting for collision repair shops. (*Id.* at ¶ 15). These details were extensively shared during in-person meetings and phone discussions, during which AirPro outlined planned service enhancements exclusively to its business operations. At the time of these disclosures, the combination of these tools and processes was unique in the industry and Drew

24

Technologies/Opus <u>did not</u> have an established process or toolset to effectively serve the collision repair segment. (Margol Dep. at 57:7-12, 65:14-66:17, ECF No. 54-3, PageID.2085-87).

The above sequence of events presents at least a genuine issue of fact as to whether Drew Technologies used the information provided by AirPro to develop its product. That is, Drew Technologies was trying, and failing, to develop a product that could service the collision industry for an extended period of time. It was only <u>after</u> AirPro shared its proprietary information with Drew Technologies that it was able to develop its remote scanning service offering. Such circumstantial evidence is more than sufficient to defeat Drew Technologies' request for summary judgment, especially under *Next Century Rebar*'s higher threshold for motions filed by the party with the burden of proof. *See Simply Wireless, Inc*, 115 F.4th at 281 ("[E]ven circumstantial evidence—or reasonable inferences therefrom—can defeat a summary judgment motion[.]"); *Next Century Rebar*, 115 F.4th at 489 (requiring a movant with the burden of proof to "show . . . that the evidence is so powerful that no reasonable jury would be free to disbelieve it").

## II.    THE DISTRICT COURT ERRED IN DISMISSING AIRPRO'S TORTIOUS INTERFERENCE CLAIM.

In finding that AirPro could not maintain its claim for tortious interference with its business expectancy with its customers and potential customers, the District Court improperly resolved competing issues of fact and determined that Defendants

25

had a legitimate business reason for amending the EULA and then "terminating" AirPro's license for the Giotto software. The evidence submitted by AirPro, including with respect to the timing of the amendment of the EULA once Opus acquired AutoEnginuity and became a direct competitor of AirPro, clearly establishes an issue of fact regarding Defendants' intent that must be resolved by the jury.

While Defendants claim that they amended the EULA to conform to industry standards and to try to limit alleged exposure to third party liability, the timing of their actions tells a different story, and the District Court erred in simply accepting Defendants' version of events. That is, AirPro's evidence details the surreptitious changes that Defendants made to the previous iteration of the EULA, which were targeted at driving AirPro out of business and which were implemented soon after Opus acquired AutoEnginuity and became a direct competitor of AirPro. (Margol Dep. at 41:8-10, ECF No. 54-3, PageID.2083). That evidence showed the affirmative steps Opus took to modify its EULA to target AirPro and effectively cut off AirPro's source of software, in an effort to drive it out of business so Opus could absorb that customer base.

Moreover, Opus took these steps despite assurances from Defendant Herron that Opus's acquisition of AutoEnginuity would not change the parties' relationship and that AirPro should continue to do business with AutoEnginuity, and it continued

26

its targeting of AirPro by actively trying to assist Ford in its lawsuit against AirPro, beginning shortly after Opus's acquisition of AutoEnginuity. (Olsen Dep. at 236:12-237:10, ECF No. 6202, PageID.2548; Emails, ECF No. 54-11, PageID.2146-47).

The reasonable inference to be drawn from the above facts is that Defendants amended the EULA not for any legitimate business purpose, but to improperly target AirPro's entire business model right after it became both AirPro's supplier of software and its competitor. Such circumstantial evidence regarding Defendants' motive and intent is sufficient to survive summary judgment. *See Paterek v. Village of Armada*, 801 F.3d 630, 647 (6th Cir. 2015) (finding issue of fact precluding summary judgment on issue of motive, because "circumstantial evidence, like the timing of events" can support an inference regarding actual motive).

Another purported basis of the District Court's dismissal of AirPro's tortious interference claim is its conclusion that "AirPro violated the terms of the New EULA" by allegedly making certain statements in is scan reports and on its website. (Opinion, ECF No. 65, PageID2754). But this conclusion entirely misses the mark. In reaching its conclusion, the District Court relied on (1) AirPro's Certificates of Scans from June to September 2021, which contain the statement: "*AirPro* utilizes embedded OEM software with OEM compliant interfaces which meet or exceed OEM requirements*[;]" and (2) historical screen shots of AirPro's webpage, which contain the statement: "AirPro Diagnostics is the most advanced, remote diagnostics,

27

calibration, and programming services on the market today! Our scan tool uses only licensed OEM information and software directly connected to the vehicle[.]" (*Id.* (citing ECF No. 53-19; ECF No. 61-5)).

Simply put, the foregoing statements were not a breach of the New EULA, because they do not contain a prohibited statement. Nowhere in either statement does AirPro assert that services provided using the Giotto software are equivalent to OEM diagnostic systems, which is all that the New EULA prohibits. Thus, to the degree the District Court based its ruling on these alleged breaches of the New EULA, that decision was reversible error.

Finally, and perhaps most importantly, the District Court erred in finding that AirPro could not show improper interference by Defendants because, according to the District Court, Defendants were doing nothing more than permissibly competing with AirPro. (Opinion, ECF No. 65, PageID.2755). In reaching this conclusion, the District Court relied on the concept that it is generally not improper interference when a defendant "simply takes the initiative to gain an advantage over the competition." *Id.* (quoting *Knight Enterprises, Inc. v. RPF Oil Co.*, 299 Mich. App. 275, 282, 345 N.W.2d 345 (2013)). But the District Court applied *Knight*'s holding far too broadly in dismissing AirPro's claim.

Indeed, another Court in the Eastern District of Michigan recently put a finer point on the holding of *Knight*, which demonstrates why summary judgment should

28

not have been granted to Defendants here.  In *Sunrise Foods Int'l, Inc. v. Agridient*, *Inc.*, 2025 WL 1643741 (E.D. Mich. January 24, 2025), the Court addressed the issue of the required showing of improper interference.    After quoting the above proposition from *Knight*, the Court also noted that "liability may not be predicated on the fact that the defendant merely 'outbid and outmaneuvered' the plaintiff[,]" but then it added the following:

> But this principle only goes so far; "if the plaintiff proves that the interferor 'intentionally and actively induced the breach', an otherwise lawful act may be unlawful." . . . And although competitive behavior is not per se unlawful, "a genuine issue of material fact is raised when a plaintiff demonstrates that the interferor's 'competition' was merely a guise to 'induce the breach of a competitor's [interest] in order to secure an economic advantage over that competitor.'"

*Id*. at *7 (emphasis added) (citing *Feldman v. Green*, 138 Mich. App. 360, 376, 360 N.W.2d 881 (Mich. Ct. App. 1984)).

In *Sunrise Foods*, the defendant, like Opus here, was both a supplier to, and a competitor of, the plaintiff.  *See id*. at *2.  The plaintiff alleged that the defendant had intentionally supplied it with defective product that it knew the plaintiff would then sell to its customers, with the intent of subsequently "swooping in" and taking the plaintiff's place with respect to those customers.  *See id*. at *9.  The Court found that these allegations, taken as true, raised the inference that the defendant "both intentionally and improperly interfered with [the plaintiff's] business relationships and expectancies" with its customers.  *Id*. at *11.

29

That is precisely what AirPro's evidence shows here.  AirPro is not simply alleging that Defendants attempted to compete with AirPro in the collision repair space.  Rather, AirPro has alleged that, once Opus acquired AutoEnginuity and thereby both (1) became a direct competitor of AirPro; and (2) controlled the lifeblood of AirPro's business, Opus amended the EULA with the specific intent of targeting AirPro's business model and trying to drive it out of business, so that Opus could absorb AirPro's customer base.  This conclusion is supported not only by the nature of the amendments to the EULA (New EULA, No. 1-4, PageID.31-32), but also by the timing of those amendments, which took place right after Opus acquired AutoEnginuity (Margol Decl. at ¶ 18, ECF No. 54-2, PageID.2077; Olsen Dep. at 141:8-15, ECF No. 54-2, PageID.2101). This evidence is more than sufficient to demonstrates a genuine issue of material fact as to whether Defendants engaged in improper interference.

Notably, the cases relied on by the District Court in concluding otherwise are factually inapplicable here.  For example, in *Knight*, it was undisputed that the customer at issue had specifically represented to the defendant that it was not under any contract obligation to the plaintiff at the time the customer entered into its contract with the defendant. *Knight*, 299 Mich. App. at 277.  Because the defendant had been told that there was no business relationship between the customer and the plaintiff, there was no basis to find improper interference based on any competitive

30

activities of the defendant.  *Id*. at 282.  And in *Feldman v. Green*, 138 Mich. App. 360, 360 N.W.2d 881 (Mich. App. 1984), the plaintiff "admit[ted] that the sole basis for bringing the complaint rested in the fact that defendants had outbid and outmaneuvered him[.]"  *Id*. at 377.

The facts as established by AirPro are far more egregious than those at issue in *Knight* and *Feldman* and are akin to those found in *Sunrise Foods*.  This is not a case where one competitor simply "outbid and outmaneuvered" another, but instead is one in which Opus wrongfully, and surreptitiously, took advantage of its newfound position as both competitor and supplier to AirPro to try to drive AirPro out of business, all while telling AirPro that nothing had changed about the parties' relationship and that AirPro should continue to conduct business with AutoEnginuity as usual.  Those facts raise issues that must be resolved at trial.

## III.   THE DISTRICT COURT ERRED IN DISMISSING AIRPRO'S UNFAIR COMPETITION CLAIM.

The final error committed by the District Court was its dismissal of AirPro's unfair competition claim.  In its opinion, the District offered no real analysis of this claim, instead deciding, in conclusory fashion, that the claim should be dismissed because it was also dismissing AirPro's tortious interference claim.  (Opinion ECF No. 65, PageID.2756.)  But even if the District Court had correctly dismissed the tortious interference claim (which it did not), the fact remains that a claim for unfair competition is an entirely distinct cause of action with different elements, and AirPro

31

clearly presented a sufficient factual basis for submission of that claim to the jury. As such, reversal is warranted.

As the District Court recognized, "the essence of unfair competition is fair play." *Id*. And as the Court also recognized, unfair competition can be shown through evidence establishing "acts that are contrary to good conscience"; "a level of rascality that would raise an eyebrow"; and actions that are not "the decent thing to do in trade." *Id*. Moreover, each case "is determined upon its own facts and relief is based upon the principles of common business integrity." *Good Housekeeping Shop v. Smitter*, 254 Mich. 592, 596, 236 N.W. 872 (1931) (citation omitted).

Of course, the foregoing standard is far less stringent than what is required to establish a tortious interference claim, which demands proof of either a per se wrongful act or an unjustified act done with malice. (Opinion, ECF No. 65, PageID.2752). Despite these differing legal standards, the District Court simply concluded that, because the same conduct was relied on by AirPro to establish both claims, the Court's dismissal of AirPro's tortious interference claim mandated dismissal of its unfair competition claim as well. This was error.

Certainly, the facts recounted above meet the above definitions of "unfair competition," and Defendants' claim that their version of the facts show nothing more than legitimate business concerns simply highlights the fact that a trial is

32

required to resolve the issue of Defendants' intent in taking the actions they did. In sum, the evidence presented by AirPro establishes that:

- Prior to January 2020, AirPro was licensing its Giotto software from AutoEnginuity.

- Prior to January 2020, Opus was a competitor of AirPro.

- In January 2020, Opus acquired AutoEnginuity, thereby gaining control of the software used by AirPro in its business.

- At that time, Defendant Herron assured AirPro that the acquisition of AutoEnginuity would not impact AirPro and that AirPro should continue to do business with AutoEnginuity.

- Despite these assurances, Opus immediately undertook to assist Ford in its lawsuit against AirPro.

- Opus then made the decision to modify the AutoEnginuity EULA, adding terms that directly targeted AirPro's business model.

- The New EULA was implemented without giving any notice to AirPro that it was happening.

- The New EULA contained restrictions on how the licensee could market the software.

- The New EULA also appeared to prohibit AirPro's entire remote diagnostic business model, a fact confirmed by the claims asserted by

33

Opus in this lawsuit, in which it sued AirPro for violation of the geographic restriction provision of the New EULA.

- Following implementation of the New EULA, Brian Herron began threatening to terminate AirPro's license, alleging breaches of the previously undisclosed EULA.

- Despite AirPro's repeated, good faith attempts to address the "concerns" raised by Opus, and despite the fact that even Jay Horak of AutoEnginuity conceded that AirPro's proposed solutions would adequately address those concerns, Opus nevertheless purported to "terminate" AirPro's license to the Giotto software and refused to provide critical updates to that software, forcing AirPro to scramble to find new software and hardware providers, at a significant cost.

Accepting all of the foregoing facts as true, as the District Court was required to do, leads to the inescapable conclusion that AirPro has a viable claim for unfair competition, because they set forth a very clear pattern of conduct by Defendants that is the antithesis of "fair play."  It was therefore error for the District Court to grant summary judgment with respect to this claim.

## <u>CONCLUSION</u>

For the foregoing reasons, AirPro respectfully requests that the Court reverse the District Court's grant of summary judgment in favor of Defendants.

Respectfully submitted,

VARNUM LLP
Attorneys for Appellant

Date:  March 20, 2026

By: */s/ Neil E. Youngdahl*
Adam J. Brody (P62035)
Neil E. Youngdahl (P82452)
VARNUM LLP
P.O. Box 352
Grand Rapids, MI  49501-0352
ajbrody@varnumlaw.com
neyoungdahl@varnumlaw.com

35

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This Document complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App.

P. 32(a)(7)(f), this document contains 7,946 words.

2.      This document complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using 14-point type.


Date: March 20, 2026                        By: */s/ Neil E. Youngdahl*
                                                    Neil E. Youngdahl (P82452)
                                                    neyoungdahl@varnumlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 20, 2026, I electronically filed this document with the

Clerk of the Court using the ECF system, which will send notification of the filing

to all ECF filing participants.


Date: March 20, 2026                     By: */s/ Neil E. Youngdahl*
                                               Neil E. Youngdahl (P82452)
                                               neyoungdahl@varnumlaw.com

**ADDENDUM**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| ECF No. | Description of Entry | Page ID |
|---|---|---|
| 1 | Complaint and Attached Exhibits | 1 - 51 |
| 21 | Answer and Counterclaims | 403 - 456 |
| 53 | Defendants' Motion for Summary Judgment, Brief in Support, and Exhibits | 1627 - 2031 |
| 54 | Plaintiff's Motion for Summary Judgment, Brief in Support, and Exhibits | 2032 - 2165 |
| 61 | Defendant Opus IVS, Inc.'s Response to Plaintiff's Motion for Summary Judgment and Exhibits | 2192 - 2484 |
| 62 | Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and Exhibits | 2485 - 2636 |
| 63 | Defendant's Reply in Support of Motion for Summary Judgment and Exhibits | 2637 - 2683 |
| 64 | Plaintiff's Reply in Response to Opposition to Defendants' Motion for Summary Judgment | 2684 - 2725 |
| 65 | Opinion and Order | 2727 - 2761 |
| 66 | Judgment | 2762 - 2763 |
| 69 | Notice of Appeal | 2968 - 2970 |